All right, Ms. Davidson. Good morning. May it please the Court. This case, as the Court, I'm sure is aware, involved a situation that began as my clients, the Mulveys, my client Mr. Mulvey is sitting with me and Mrs. Mulvey is sitting in the courtroom, they sought to purchase from a company called LPG, a piece of unimproved real estate in Comal County, and they entered into a trek contract with Ms. Davidson. We've read the briefs and we know the underlying facts. You may certainly refer to them as you make your arguments, but you need to move on to your arguments. Absolutely. So the key element, the key situation seems to be here that a question of what was purchased or what was being sold. There's a statute, two statutes in Texas in the Occupations Code, Section 1101.045, and formerly Property Code, Section 5086, now 50205, that say that one who is selling or assigning an interest in or an option in real property must disclose that fact to the purchaser, and in this case that was not done, and ultimately at trial, the district court decided that those provisions which required disclosure by LPG to the Mulveys were inapplicable. In a motion for summary judgment hearing that was held three days before the trial of this case began. That's what you say the original error was. Yes. Yes. I mean, I've certainly read the legislative history and the articles about wholesaling, but what's your best Texas case that says old 5.06 prohibits this double-closing type transaction? There isn't a case yet on that. However, the existing law, as the Court knows from looking at the legislative history, is that already it's illegal to do brokering without a license in Texas, and that is exactly what happened in this case, and the without a disclosure. Let me be clear. Texas has basically decided with those two statutes to approve wholesaling, but we now require the disclosure of the fact that all that's being sold is an option or an interest in property, but there are no cases yet interpreting Section 508.6 specifically. Nonetheless, what has happened is that LPG has argued below and here in this case, in this appeal, that it was not violating either of those provisions because it was not trying to sell an option or an interest in real estate. It was the actual sale of real estate from seller to buyer. They say that repeatedly. Yeah. And our position is that that's just simply not true because when LPG obtained the option to purchase that property from the original seller, Villafana, Dr. Villafana, all they obtained was a future contingent interest to own that property, and so when they entered into the TREC contract with the Mulvies, they had nothing to sell yet. So all they had was a future potential interest in the property, and that led to this cascade of problems that happened as a result of not disclosing what was going on and the Mulvies slowly trying to discern what had happened, some of these things just becoming clear days before trial or during trial, such as a title insurance policy that was never produced beforehand for the sale. Right. Factually, we know the Mulvies, to their credit, as lawyers, did the due diligence. They did the homework. They found out about the ownership issue, and then prior to the arranged closing, they do have the deed. So it looks like at that point, it's a flip, right? LPG gets it for what, $110? Then they want to sell it for $180. But by the time the contemplated closing was going to come around, they had secured the title. They were going to hand over title to the lot. Well, we disagree with that because, first of all, there were still—I think there were four title commitments that it issued, and even on the last one that was issued, I think two days before closing was supposed to happen, three days, I think it was October 28th—it still did not show that LPG was the record owner of this property. And they objected to that on the basis of that, and I think also on the basis of a survey issue. And that issue was never corrected by—and Judge Higginson, you point out that they did get a deed, but it wasn't a recorded deed. The deed was not recorded until November 2nd in the afternoon, I believe, and that was after closing was supposed to happen, depending on the objections being cured and all of that stuff. Where was the requirement that it be recorded before the sale? Well, our position is that, for example, a title company is not going to—should not close and ordinarily does not close a deal like this unless they have record title showing in the owner of the property, and a signed but unrecorded deed did not get them to that point. That does not show good title in LPG at that moment, not yet. So as a result, this—the sale didn't close, and our position is that the district court should have held that 5086 and 1101.045 should have been applied, and that by not disclosing the fact that they did not own the property, that's the basis for all of these things that result from that failure to disclose. And were that to be fixed by, say, rendition on the issues of application of the disclosure requirement in those two provisions, I mean, obviously there would be—well, we believe that it could result in the Mulvies winning under those two provisions and the deceptive trade practice tie-in statutes and be able to recover their earnest money back and so on. That's the easiest way to get through to the end of this, what the Mulvies are seeking here. What about the counterclaim, claiming that you canceled the closing date and never tried to reschedule and therefore that you breached the contract as a matter of law? We have a couple of responses to that. One is that we did not cancel the contract. Actually, what happened is that—so we kept asking them— You canceled the closing date is what I meant to say. Oh, okay. So you mean we didn't show up for closing, basically. And never rescheduled. That's true. That's true. We did file a lawsuit for specific performance a few days before closing, specifically wanting to close on the deal. Also, we had asked for assurances from LPG several times in the form of various media, including objections to title commitments, because we still hadn't seen a title commitment that showed LPG was the record owner of this property. And under restatement sections that I've cited in our brief, I think it's 243, restatement second contracts, if a buyer repeatedly asks for assurances from the seller to prove that they can and will be able to deliver good title to property at closing in a timely fashion, and seller cannot do that, refuses to do that, and there are actually cases interpreting or maybe notes under the annotations saying—giving as an example place—situations where there's more than one owner. That hasn't been cleared up yet. Then buyer can treat that as an anticipatory repudiation of the contract and also sue for complete breach of contract damages because of the failure of the seller to show that they could close the deal, that they had good title, which is what happened here. So the Mulvies were not required to go to closing because the contract had already been anticipatorily breached, and as a result, the Mulvies also did not breach the contract. And there's been an argument that's been made, you know, in the—the district court got—when he was deciding between whether— You're saying your argument under the contract is that they effectively exercised their option to terminate the contract? I don't believe— Because he didn't ever come and pay. Pardon? He didn't come pay. Correct. He did not. Right. No, I mean, our position is that they did perform everything that they could up until the point that they—that LPG on the eve of closing still couldn't show that it was the owner of the property, and at that point, the Mulvies had performed everything that they could under the contract, and they weren't obliged to go to closing to close on a deal on property that they knew LPG didn't own. And I don't even know how that would be possible. So they didn't have to go to closing. But they had an option instead to terminate the contract, which I don't think they did. You're right. They did, and they did not. They chose to try to enforce the contract and obtain specific performance. That was their initial lawsuit in state court, to try to keep the deal, and things morphed after that, after it went into federal court. But they never tendered the sale price, right? Pardon me? Never tendered the sale price. Correct. They did not. They just proceeded with the state court. They did. They did, and then the closing or the title company said, I guess we'll just hold off on this for a while. And by the way, I mean, in the district court and in our briefing, there's been discussion about the timing of events and the cure. So the district court was really concerned about, and I'm sure that you'll hear about this from LPG's counsel, about whether LPG had breached the contract by not timely curing the problems that existed with the lack of ownership. And the district court seemed to believe, ultimately, that there was an obligation on the part of LPG to notify the Mulvies of the cure. And there's a debate about what constitutes notification of cure of the debate, and I mean, cure of the lack of record ownership. However, in this situation, we asked repeatedly, and again, we don't believe that a signed deed that hasn't been recorded is adequate to show title and LPG, because it wasn't complete and the title company would not have accepted just a signed deed in the closing on that property. I mean, the jury ruled in your favor as to intentional deception. They did. But then they said you take nothing, presumably because they didn't see any reliance in as much as before closing, you were told, we have the title. Come on in. It's yours. It's possible that that's what they thought. But I'm more inclined to believe that what happened with the jury in finding that way was that I believe that they, obviously, they didn't get to hear about this disclosure stuff. But they did see, they did learn that LPG didn't own this property when it tried to sell it to my clients. And they also, one of the things that Judge Bemprod did before, early on, he made a ruling that the economic loss rule applied, because we had a breach of contract cause of action, and we also had fraud and DTPA causes of action. And Judge Bemprod decided to essentially overrule all of our requests for any type of damages except for, I think, rental and storage, something like that. But we had, in our original jury charge submission and in our arguments in pretrial, we had many categories of damages, including earnest money. The judge threw all of those out. And we believe that what the jury saw was that there was clear fraud and knowing and intentionally deceptive actions, but they couldn't put those together with the two categories of damages that they were left with by the district court. You're sure, when I look at the charge conference, you will have objected and said, we want damages on earnest money? Well, so they're going to say that we waived it. However, what happened is that we had a pretrial hearing at which, and it was very zigzagged in ways, because also I'll point out that after ruling, economic loss damages were all, you know, prevented. Then the judge decided nobody was going to the jury on their breach of contract causes of action. So the economic loss rule should not have applied whatsoever. I'm just asking, at the charge conference, is it going to reflect that you said we want earnest money? Yes or no? It is not because the way that the judge went about asking, he first asked, do your earnest money damages, he did it piecemeal, do your earnest money damages go with the contract? And trial counsel said, I believe so. And then the judge came back around and just did a, because we had four, five, six causes of action, the judge came back around and said, all right. Well, first, the trial counsel said, what is the point of a DTPA cause of action if you're going to throw on top of it the economic loss rule? And we discussed and objected to the judge doing what he was doing, but ultimately then he decided earnest money damages also were out, even though we hadn't really been able to discuss with the judge whether the earnest money damages could be attributed to or should be tied to the DTPA damages or fraud damages or other out-of-pocket damages, he just kind of overlooked that. So whether we fully objected, it's not clear from the record. I will admit that. At the trial, didn't Mr. Mulvey say he no longer wanted to buy the property? So that was no longer an issue? Well, I think that that is, that's probably accurate, but we do believe that because the judge would not require the return of the $5,000 of earnest money, which we also requested after trial, that because the Mulveys performed as much as they could under the contract, as a result of the other side breaching it, we ended up with an equitable interest or in the property obtained by our payment of a $5,000 earnest money. What's the value of this case right now? Well, it depends on what happens here, because we believe that if we could go back with the application of those two statutes that require disclosure and the tie-in to the DTPA, that opens up all the damages that we wanted to get before. Let's ignore contract for a minute, but DTPA damages. What are your damages for not buying the property? Pardon me? Excuse me, my voice is off.  What are your damages for not buying the property? What is this case worth? Well, I think we have, I believe we have punitive damages. We have $5,000 of earnest money, and we have out-of-pocket damages, and we also have penalties and fines under the Occupations Code and under the DTPA. So depending on how bad the trier of fact thinks that LPG was in this transaction, it could be a substantial amount of money. But you can't say what? I can't. I mean, I think that the actual damages are going to be $5,000 most likely. That's the earnest money. The earnest money, yeah. Sure. And I mean, it's really going to, it's always up to the jury to decide how much, if we got punitive damages. I don't know, we didn't, I don't know the net worth information off the top of my head about LPG or how many penalties we could get or triple damages. Let's just play, pretend like it's triple damages. So it's $15,000 plus $5,000, $20,000, then on top of that, whatever sort of damages we could get under the DTPA. Okay. All right. You've saved time for rebuttal. Thank you. Mr. Snell. Good morning, Your Honors. May it please the Court, it's my intention, Your Honor, today to talk primarily about who it was that breached the contract and then also talk about the still outstanding list pendants because it's still clouding the title and exposing our client to considerable liability. Of course, I'm prepared to discuss anything else the Court has questions about, but following the Court's instructions on argument, I'm telling you what I intend to do. And if you have other things you prefer that I start from my sake with the DTPA, could you start from my sake with the DTPA, not the contract? Yes, Your Honor. And that pre-hearing ruling, because it does seem like from the oral argument, their focus is the statutory nondisclosure argument. Yes, Your Honor. Of course, the jury found that we violated the DTPA, which is rather puzzling since the jury found we did not commit fraud, we were not negligent, we didn't make negligent misrepresentations, and we didn't, well, that's it, we didn't commit any kind of fraud or mislead them in any way. They answered no to all those questions. So I've been puzzled by how the jury could do that and also find that we committed a deceptive trade practice. My personal belief is it was a compromised verdict because we were late on the third day of trial and they didn't want to come back again. Why wouldn't it just be they believed Shanahan, they didn't believe Anderson? Sorry, Judge, I'm here. Why wouldn't it just be the jury believed Shanahan and they disbelieved your witness, Anderson, and therefore they thought there hadn't been a disclosure as to the actual ownership. So therefore, what you were offering them was contingent ownership, and that's their theory that it violates what was once 5086. Your Honor, all right, let's assume they believe that. We don't know. We can only speculate about why the jury did what it did, but they answered zero on all damage questions that were submitted. Earnest Money was not submitted as damages because Mr. Mulvey's counsel expressly told Judge Bimparad that he was pursuing that under breach of contract and not DTPA, and I've quoted those exact exchanges in our brief. And then at the formal charge conference, he didn't complain at all about not submitting Earnest Money as damages. They'd already had that discussion and he had assured the trial judge that that was not part of his DTPA claim. It was only part of his breach of contract claim. So I don't think Judge Bimparad can be faulted for not submitting Earnest Money as damages. Secondly, Your Honor, I think as a matter of law, they were not entitled to the Earnest Money back because they never exercised their option to cancel the contract. Instead, they continued to insist on enforcing the contract until about midway through the case. Several months before trial, when they filed their third amended petition, they dropped their claim for specific performance. And all they did is they completely dropped and they asked only for money damages after that. Mr. Mulvey testified at trial that he no longer wished to purchase the property, and that's all in the record. So they had already disavowed wanting to buy the property. And it seems inconceivable to me that they could tie up the title of this property up to today. That's over three years that they've tied up the title by claiming an interest in this property based on that $5,000 Earnest Money with a list pendants and still expect to get the Earnest Money back. That's the third list pendants. Is it still pending? That's the third list pendants that they've filed. What's the status of it? Is it pending? Well, it's very puzzling, Judge. Judge Bimperod expunged the list pendants. And then inexplicably, Mr. Mulvey just went and refiled the very list pendants that Judge Bimperod had expunged. And that's why we're asking you to remove that and sanction them for doing that. That is clouding the title, and we are potentially liable to the nice people that bought the property ultimately from our client, because we've warranted good title to them. And if that list pendants keeps them from, say, getting a second mortgage or getting some loan they needed badly for some medical matter or no telling what, my client would have considerable exposure to liability for not giving them a clean title that they're to try to leverage money out of my client. We offered to release the Earnest Money to him if he would release it. Excuse me. Excuse me. Let me just ask you. I'm reading from your brief, and I'm reading about the relief that you're requesting. I just want to be sure that that's an accurate request. So you say this court should affirm the judgment insofar as it ordered that the Mulleys take nothing by their suit, and insofar as it awarded attorneys fees, costs, and interest to LPG, the court should reverse and render as to the award of attorneys fees to the Mulleys and should award the $5,000 Earnest Money to LPG. Is that what you're asking for? That's precise. It doesn't say anything about the list pendants. We don't deal with that. Is that right? Well, Judge, I think you do. In this court, we filed a motion to expunge the list pendants because this is the court the case was in. That's why I'm asking you the question. I'm reading from the final paragraph of your brief in which you tell us what you want us to do, and now you're telling us you want us to do something else. I'm not trying to give you a hard time, but I want to understand what is your request of this court? That is exactly our request, Your Honor, plus expunge the list pendants. That was requested of this court in a motion to expunge the list pendants filed in this court, and this court said that you would carry that motion and presumably decide it when you decide the merits. That's still out there, and I'm still asking you to expunge the list pendants. But in your breach of contract counterclaim, the only relief you're asking for is the $5,000? You're not asking for a trial? If you win on your cross appeal? Well, in our counterclaim, we ask for attorney fees and the $5,000, Your Honor. Those are the two things we ask for. We've already gotten an award of our attorney fees, and if that's left undisturbed, then the only thing left there on the breach of contract is the $5,000 because the district court just left it in limbo with the title company, where I suppose someday it would eventually eschew to the state of Texas because the title company isn't going to release it, you know, unless both sides agree, and that's apparently not ever going to happen. So we are asking that you declare that we're entitled to that $5,000 for Mulvey's breach of his contract. I would like to take a moment to, unless the court rathers me address something else, to discuss the breach of contract, and I believe I provided you with a little easier-to-read version of paragraph 6D. I hope it made its way up there to you. Yes, that's it. Thank you. Your Honor, as you can see from looking at that, there are two times in that paragraph that objections or notices are required. The first one is five days after the buyer receives a commitment and exception documents, he's got to give notice within five days or those complaints are waived. But it does say that those objections are not waived as to Schedule C items. Now, Schedule C items are things that the title company insists they have before they'll issue a policy. Typically, they won't issue a policy, you know, to someone when the seller doesn't have a good title, for example. So the title company wants assurance that the seller has a good title, understandably, because, you know, they risk a lot of money for a pretty small premium. So Title C are things that the title company insists on having. Now, of course, everybody understands this was intended always as a double closing. In one closing at a title company, we were purchasing the property. We, LPG, was purchasing the company from Dr. Villafana. And at the same closing, we were selling the property to Mr. Mulvey. Now, when Mr. Mulvey canceled the closing and didn't show up and sued us and the title company, we went ahead anyway. We bought the property from Dr. Villafana. And, of course, the deed he'd already tendered to the title company to hold an escrow was recorded the next day because the title, you know, Dr. Villafana got his purchase price. We paid it. And so we got good title from Dr. Villafana on November 1. It didn't get recorded till the next day. At least that's when it's stamped. But I don't think that's of any significance. It's not the contract didn't require that the deed be recorded on the day of closing. And it's often the case that in actual practice, when things are sent to the county clerk's office for recordation, it may not get actually recorded till the following day, depending on their workload and what time of day it gets there and things like that. But there was nothing in the contract with Mr. Mulvey that required that we provide a recorded deed from our predecessor in title. That's why the title company acts as escrow agent. Mr. Mulvey should have tendered his purchase price. We should have tendered our deed. And the title company would hold those. And when the title company was convinced that it had the money from Mr. Mulvey and had the deed from us, it would have released the deed from us to Mr. Mulvey and released Mr. Mulvey's deed to us. But Mr. Mulvey didn't do that. He just simply filed suit and filed a list and canceled the closing. He never came back and asked to go ahead with the closing. He never asked for any kind of assurance that there was good title. Because, you know, of course, the title company wouldn't have closed without good title. The only thing he really asked for is he wanted to see during the course of the negotiation leading up to the closing, he wanted to see our client's contract with Dr. Villafana. And our client wasn't willing to give him that contract because, for one thing, it's not Mr. Mulvey's business how much profit my client had in the transaction. You know, we had a contract with Dr. Villafana to buy it for $130,000, which was Dr. Villafana's asking price. That's in the record. There was no negotiation with Dr. Villafana. And then Mr. Mulvey offered us $180,000. And so that was a nice gross profit. But that's not net profit. My client has, the record shows, he has 60 employees. And one among the things they do and he does is he looks for transactions like this where he can make offers on property that he thinks he might be able to acquire at a price that he can soon resell for a higher price. That's the business they're in. And it's a perfectly legitimate business. There's nothing illegal about it. Texas law does not... It's not an act of a brokerage. I'm sorry? Not an act of a brokerage. You're not a broker? Well, you're not a broker, Your Honor. First of all, there was a licensed broker in this transaction. I think the court's seen that in the record. But what my client did, employees of an entity can sell the entity's property without being a broker. They can do that. And that's the administrative rule, just a minute, 535. And it says if we have equitable title or a right by contract with the record owner to sell it, then we can sell it and that's not brokerage. That's the Texas... Just a moment, let me find 535 and I'm just not finding the exact correct citation. Yeah, I'm sorry. It's 537.11. No, that's not it. That's the one that says we don't have to... The realtor did not have to use the correct contract. The Texas rules allow the realtor to use a contract prepared by an attorney. So that has to do with the construction of the contract in favor or against either party. This was not a requirement. They could have, if Mr. Mulvey wanted a different contract, he could have prepared as an attorney or had an attorney and the realtor would have been allowed to use it. Wait a minute, I'm looking for the... I'm sorry, Your Honor, I don't want to take any other time. I promised you in our brief cited the TEA rule that... It's there, it's there. Okay, thank you, I'm sorry. This is really embarrassing. Is there much law interpreting what was 06 and what is now 205? No, sir, not that I'm aware of. Not even supporting your position that this type of double closing isn't wholesaling, triggering disclosure. Well, I can't find any case law on that, Judge, and I've looked pretty hard. I can't find... Your answer is a factual one that this wasn't... Your answer is a factual one that you weren't just... You weren't selling an option to buy. You were selling the deed. You were giving the deed over. Is that your answer? Yes, Your Honor, and that the regulations of TREC make it clear that when you're selling property that you either have equitable title to or you have some contractual right to sell and to acquire equitable title. That is not brokerage. You don't have to have a license. That's that Rule 535 that I'm not coming up with. Do you... Help, Mr.... Yes, Your Honor, it's Texas Administrative Code 535.5C. That's the one that excuses us expressly from having to have a license to sell property that we have under contract to acquire equitable title to. That's not brokerage. We did not need a license. And anyway, I want to point out, Your Honor, that there was no... The only pleading... The only thing that could come under would be DTPA because in the breach of contract claim Mr. Mulvey made, the only complaint he had was the water rights. He had no... He did not plead any breach of contract for failing to give notice. And we brought that to the attention of the trial court timely in a hearing on a motion for new trial. That is cited in the record as well. So he... There was no breach of contract claim for failing to give this notice. The contract itself is silent on any requirement that we give notice to Mr. Mulvey that we've cured his objection. In fact, the contract very clearly puts the onus on the buyer. It says in the middle, if he first makes objections, there's a 15-day cure period. And then the contract says if objections are not cured within the cure period, the buyer may, by delivering notice to seller within five days after the end of the cure period, terminate this contract and the earnest money will be refunded to buyer or waive the objection. So the onus was on the buyer within 15 days after the cure period that he had to either give notice of termination or his objections to the title were waived. And he did not give notice of termination. His objections to the title were waived, which means he breached the contract by not closing, by not going through with the purchase of the property. And that's what I believe the district court should have ruled and I'm asking this court to rule at this time. In terms of the attorney fees, Your Honor, we weren't seeking them under Chapter 38 of the Civil Practice and Remedies Code. We were seeking them under the contract, Paragraph 17, which gives attorney fees to the prevailing party. And by no stretch could anybody with a straight face argue that Mr. Mulvey prevailed at all. He was suing my client for somewhere north of $500,000, and if you want to count triple damages, he was suing my client for maybe $1.5 million. The exact number was never made clear by him. And what he walked away from the case with was a tape-nothing judgment and a net judgment against him for about $40,000 in attorney fees. We were awarded approximately $80,000 for trial and he was awarded about $40,000. So the only thing he got was a negative net judgment against him for about $40,000. I can't imagine how in anybody's book that could be treated as him being the prevailing party. And so we were entitled and we alone were entitled to attorney fees. The court gave him attorney fees because the court found that he prevailed on our breach of contract claim against him. But the only thing we sought in our breach of contract claim was attorney fees and the earnest money. And that's on the counterclaim? That's the counterclaim? Yes, Your Honor, that's the counterclaim, right. And the trial court gave him damages for defeating that counterclaim, but he really didn't because we were awarded our attorney fees. And the only thing we didn't get is the earnest money, but neither did he get the earnest money. It was just with the title company. So, Your Honor, we are asking that you affirm this judgment except to the extent that it awarded Mr. Mulvey attorney fees and that you declare that LPG is entitled to the earnest money. Thank you very much, Your Honor. All right, thank you, Mr. Snow. By the way, it's quite an honor to get to appear before you today. This is probably my last argument. I'm retired after 52 years and what a wonderful way to go out. This is probably my last appellate argument, probably trial argument either. So, I'm really honored to be able to do that here. Thank you very much. Thank you, Mr. Snow. Ms. Davidson for a vote. So, we did get something from the jury. They did find that LPG engaged in knowing false, misleading, deceptive trade practices actions, and we also believe that they found that the contract was fraudulently induced. Because this was an act of brokerage, this double closing that they are talking about is not okay under these sections that the judge decided did not apply, because the double closing fact of this was not informed, was not told to the Mulveys. There was mention of an absence of a failure to—a claim for breach of contract for failure to disclose under these statutes. There was no obligation. That's not a breach of contract claim. That's simply—that was—they were required to disclose that they were double closing. This section of TAC, which ostensibly— Double closings happen all the time. True. And you don't have a single Texas case. That's true, and that is because in Texas, wholesaling or double closing has been allowed, and the legislature did go ahead and decide to allow it to stay that way. There are other states that are taking that away, but Texas is the way that it is, and the—what TREC basically got the legislature to do in 2017 and then re-up in 2023 was, while still allowing wholesaling or double closing, make there be a disclosure requirement, because otherwise it's brokerage without a license, and the fact that they're—I mean, we've heard how much profit they make, and what—they're obviously making money by selling property that they don't own. This TAC exception doesn't apply here because they—LPG was required to own the property or have equitable title to the property to be able to sell it as the owner under that section. LPG did not have equitable title. All it had was a contingent future interest. It had an option agreement, and an option agreement does not pass title or convey an interest in property, so they were wholesaling without disclosing it to people who were buying this property from them, and there are other problems that, you know, that we haven't gotten into that can happen with—there's a couple of law review articles that we've cited. One is from an Oklahoma law review article, and they talk about how this double closing wholesaling can not only create problems for the Mr.—you know, Dr. E. Fonaguy or for the Muldeys on the other end. It can also create problems for LPG because arguably— But what you just told us, if I understood it, was, though, that the—if that's a problem, the Texas legislature has failed or refused to fix it. Well, they decided—the Texas legislature has decided wholesaling is okay as long as it's disclosed. So, it wasn't disclosed here, which caused the cascading of all of these events of them not knowing what was going on and finding out piecemeal what was happening or who actually— It was covered and cured. Well, we disagree that it was cured because there had to be record title. I mean, I realize that they say that handing over a deed that's signed is adequate, but a title policy won't issue without a recorded deed. So, there may be an issue of timing there, but they—at the time that closing was supposed to happen, there wasn't a recorded deed. Before your time runs out, what's the timing and justification for the third Liz Bendit? Well, it— When was it filed? I believe it was filed after the judgment was obtained in the underlying case because we got a judgment lien for—well, we got an attorney's fee award, and then my client went and abstracted that. So, there is a judgment lien existing, and that was what allowed him to place the Liz Bendits on the property. I do think that it's interesting, I mean, that there's so much by LPG about how harmful and problematic and everything the Liz Bendits were or are, but they were able to sell the property to this Gallegos person somehow, even though there was a Liz Bendits and a judgment lien against the property. I don't know the answer to how that ever happens, how a title company issues a title policy or closes on a deal when that's the case, because that's exactly the kind of situation—it's similar to the situation that the Mulvies were in when being expected to close without having all of their objections to the title commitments cured or knowledge of who was the real—or, you know, proof of the real record owner being LPG, the seller, by the time it closed. All right. Thank you, Ms. Davidson. Thank you. Your case and all of today's cases are under submission, and the Court is in recess until 9 o'clock tomorrow.